UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
— — — — — — — — — — — — — — — — — — — — — — — — — — x

| | | |
|---|---|---|
| SDL, plc | : | |
| | : | |
| Plaintiff, | : | Case No. 18-cv-07799 (JMF) |
| | : | |
| - against – | : | ORAL ARGUMENT REQUESTED |
| | : | |
| AVAYA, INC. | : | |
| | : | |
| Defendant. | : | |

— — — — — — — — — — — — — — — — — — — — — — — — — — x


## DEFENDANT'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF ITS MOTION TO DISMISS</u>


**BRYAN CAVE LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

PLAINTIFF'S ALLEGATIONS ....................................................................... 2

STANDARD OF REVIEW .............................................................................. 4

ARGUMENT ................................................................................................... 5

I.      Plaintiff's Claims Are Wholly Barred by Avaya's Bankruptcy Proceedings ...................... 5

    A.      Plaintiff Declined to File a Claim or Objection in the Bankruptcy Court .............. 6

    B.      Any Breaches of the Agreement, Including Those Alleged in the Complaint, Were Deemed Satisfied Upon the Agreement's Assumption Pursuant to the Bankruptcy Plan, Under Which Plaintiff Never Filed a Claim or Objected .......... 9

II.     Plaintiff Fails to State a Breach of Contract Claim Because the Agreement's Plain Language Belies Plaintiff's Allegations ...................................................... 12

    A.      Plaintiff Has Not Alleged Its Own Performance Under the Agreement .............. 12

    B.      Plaintiff's Claims Rest on a Series of Legally Impermissible Readings of the Agreement ...................................................................... 14

        1.      Plaintiff's claims for license fees depend on mistaken interpretations of the Agreement .................................................... 14

            a.      Plaintiff's reading of "Source Words" is contrary to the Agreement's plain language and standards of commercial reasonableness and would lead to absurd results. ......................... 15

            b.      Even if Avaya were liable for additional license fees, Plaintiff may not ignore the license fee cap. ................................ 16

        2.      Plaintiff's reading of "fixed" hosting fees is contrary to the Agreement's plain language. ................................................ 17

        3.      Plaintiff's claims for maintenance fees violate the Agreement's plain language. ................................................................ 19

III.    Plaintiff Fails to State a Claim for Unjust Enrichment ..................................... 21

CONCLUSION ................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Arriva Pharm., Inc.*,
   456 B.R. 419 (Bankr. N.D. Cal. 2011) ....................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................4

*Chespeake Energy Corp. v. Bank of N.Y .Mellon Trust Co, N.A.*.,
   773 F.3d 110 (2d Cir. 2015),
   *aff'd*, 837 F.3d 146 (2d Cir. 2016) ........................................................................17

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
   371 F. Supp. 2d 510 (S.D.N.Y. 2005),
   *aff'd*, 168 Fed. App'x 474 (2d Cir. 2006) ................................................................5

*Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*,
   70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987) .............................................................21

*Conopco, Inc. v. Roll Int'l*,
   231 F.3d 82 (2d Cir. 2000)........................................................................................4

*Daewoo Int'l (Am.) Corp. Creditor Tr. v. SSTS Am. Corp.*,
   No. 02 CIV. 9629 (NRB), 2003 WL 21355214 (S.D.N.Y. June 11, 2003)............10

*Day v. Moscow*,
   955 F.2d 807 (2d Cir. 1992)......................................................................................5

*In re DPH Holdings Corp.*,
   553 B.R. 20 (Bankr. S.D.N.Y. 2016).................................................................17, 18

*Feigen v. Advance Capital Mgmt. Corp.*,
   150 A.D.2d 281, 541 N.Y.S.2d 797 (1st Dep't 1989) ...........................................21

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
   219 F. Supp. 2d 576 (S.D.N.Y. 2002),
   *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)......................................................................................6

*Goldman v. Metropolitan Life Ins. Co.*,
   5 N.Y.3d 561, 807 N.Y.S.2d 583 (2005) .............................................................21

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
   74 A.D.3d 413, 903 N.Y.S.2d 346 (1st Dep't 2010) ...........................................14

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996)....................................................................................2

*ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC*,
   No. 601860-2009, 2010 WL 653972 (Sup. Ct. N.Y. Cnty. Feb, 24, 2010).................5, 14, 16

*Kolbe v. Tibbetts*,
   22 N.Y.3d 344, 980 N.Y.S.2d 903 (2013) ..........................................................13

*In re Lehman Bros. Holdings, Inc.*,
   645 Fed. App'x 6 (2d Cir. 2016).............................................................................6

*NFL Enters. LLC v. Comcast Cable Commc'ns*,
   51 A.D.3d 52, 851 N.Y.S.2d 551 (1st Dep't 2008) .............................................18

*Olin Corp. v. OneBeacon Am. Ins. Co.*,
   864 F.3d 130 (2d Cir. 2017)..................................................................................13

*OneBeacon Ins. Co. v. Empress Ambulance Serv., Inc.*,
   No. 02 Civ 2595 (WHP), 2003 WL 1857622 (S.D.N.Y. Mar. 28, 2003)..............10

*Papasan v. Allain*,
   478 U.S. 265 (1986)................................................................................................4

*Poindexter v. EMI Record Grp. Inc.*,
   No. 11 Civ. 559 (LTS)(JLC), 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ........5

*Roberts v. Bliss*,
   229 F. Supp. 3d 240 (S.D.N.Y. 2017).....................................................................5

*Roman Catholic Diocese of Brooklyn v. Christ the King Regional High School*,
   164 A.D.3d 1390, 84 N.Y.S.3d 246 (2d Dep't 2018) ..........................................13

*Transcience Corp. v. Big Time Toys, LLC*,
   50 F. Supp. 3d 441 (S.D.N.Y. 2014).............................................................12, 14

*In re Wireless Data, Inc.*,
   547 F.3d 484 (2d Cir. 2008)....................................................................................9

**Other Authorities**

11 U.S.C. § 524(a)(2)...............................................................................................................11

Fed. R. Civ. P. 10(c) .................................................................................................................2

Merriam-Webster, *available at* https://www.merriam-
    webster.com/dictionary/fixed...............................................................................................18

## PRELIMINARY STATEMENT

A year after filing for bankruptcy protection, Avaya successfully confirmed its chapter 11 plan and emerged as a reorganized entity on December 15, 2017. Despite the "fresh start" granted to defendant Avaya, Inc. ("Avaya") by federal bankruptcy law and its confirmed plan, plaintiff, SDL, plc ("Plaintiff"), seeks to pursue this meritless lawsuit against Avaya concerning a contract assumed as part of those bankruptcy proceedings. These claims, brought more than nine months after they were discharged, are barred. Avaya respectfully submits that this Court should enforce the injunctions provided by the bankruptcy court and bar Plaintiff from asserting any pre-assumption claims against Avaya arising from the assumed Agreement.

Even absent the bar from the bankruptcy court, the Amended Complaint is utterly meritless because Plaintiff has plainly misread the parties' contract. Every single theory of liability presented in the Amended Complaint ("Complaint" or "Compl.") rests on an obvious misconstruction of the written agreement executed by Plaintiff and Avaya in 2006. Despite a course of dealing that has spanned over a decade, Plaintiff suddenly (and creatively) tortures the contract's language to reach the unsupportable conclusion that Avaya owes a sum "believed to be in excess of $7 million." Compl. ¶ 37. But try as Plaintiff might, it cannot recover based on readings of the contract that are belied by its plain language and standards of commercial reasonableness. Therefore, aside from being barred by the bankruptcy proceedings, Avaya moves to dismiss Plaintiff's Complaint because it is entirely dependent on contractual interpretations that are flatly wrong.

## PLAINTIFF'S ALLEGATIONS

This dispute arises under the SDL Enterprise Software License and Maintenance Agreement with Optional Hosting Facility ("Agreement") executed by the parties on August 31, 2006, as amended.[1] Compl. ¶ 1. The Agreement grants a license of Plaintiff's translation software to Avaya. *Id.* Plaintiff alleges that Avaya breached the Agreement by purportedly exceeding an allocation of 1.7 million "Source Words" to be translated annually and failing to pay additional "License Fees," from a period ranging from 2012 to the present. Compl. ¶¶ 2-5. The Agreement provides, in pertinent part:

> TMS base license includes 1.7 million words of English language material (known as "Source Words") per annum. Source Words are only considered within this allowance if the words are actually processed for translation, and not if they are matched by the translation memory process.

Agreement at 10. Plaintiff contends that the sentence, "Source Words are only considered within this allowance if the words are actually processed for translation, and not if they are matched by the translation memory process," applies to Source Words after they are translated, allegedly "clarifying" that "Avaya will not be charged extra based on the number of words post-translation." Compl. ¶ 15.

With respect to license fees, the Agreement provides:

**License Fee**: $150,000

[. . .]

*Additional capacity*: capacity increases allowing for increased increments of source word throughput, referenced to as "TMS Content Scaling". Each increment provides for an ongoing annual increase of 500,000 words in the source word throughput capacity.

---

[1]   The Agreement is attached to the Complaint as Exhibit 1. "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes," Fed. R. Civ. P. 10(c). and this Court may review the entire Agreement in consideration of this motion, *Harsco Corp. v. Segui*, 91 F.3d 337, 340 (2d Cir. 1996).

For increments between 1.7million and 2.7million: $75,000 per 500,000 words
For increments between 2.7million and 3.7million: $68,750 per 500,000 words
For increments between 3.7million and 4.7million: $62,500 per 500,000 words
For increments between 4.7million and 5.7million: $56,250 per 500,000 words
For increments between 5.7million and 6.7million: $50,000 per 500,000 words
For increments between 6.7million and 7.7million: $43,750 per 500,000 words

Once annually, the parties will review utilisation of Source Words and will determine if any increase in licensed capacity is necessary.

[. . .]

*License fee cap*: The maximum license fee payable under this agreement, including any additional capacity and the CMS connector licenses but not including Author Assistant or any other additional licenses as described in this section, is $700,000. At the point that a license fee of $700,000 is reached for the relevant license, such licenses become "unlimited" with regard to volume.

Agreement at 10-11. Plaintiff states that, while Avaya has paid the $150,000 licensing fee, Avaya still owes a license fee of at least $550,000 for exceeding the 1.7 million-word allotment of "Source Words" from 2012 through July 2018. Compl. ¶¶ 18, 21.

Plaintiff also contends that Avaya owes "Hosting Fees." With respect to this, the Agreement provides: "Hosting Fee:  $20,000 per annum, fixed with regard to usage, capacity limits, number of authorized users and number of Author Assistant licenses or SDL Trados licenses." Compl. ¶ 25; Agreement at 10. Plaintiff contends that hosting fees are "banded" for each capacity limit of 1.7 million words, such that for each increment of 1.7 source words, a customer owes an additional $20,000 fee per year. Compl. ¶ 27. Under this interpretation, Plaintiff contends that Avaya owes $880,000 in hosting fees. Compl. ¶ 28.

Plaintiff next alleges that Avaya owes "Maintenance Fees." The Agreement states that maintenance fees are "$22,500 per annum variable in accordance with the terms of this Agreement." Compl. ¶ 29 (quoting Agreement at 10). The Agreement also provides, in pertinent part:

4.2   Maintenance Fee. . . . SDL will provide written notice to the Customer not less than sixty (60) days prior to the end of the Initial Support Period or Renewal Support Period by way of an invoice for the next Renewal Support Period. The Customer may elect to proceed with the next Renewal Support Period, or may terminate this Agreement as of the end of the Initial Support Period or a Renewal Support Period . . . The Maintenance Fee shall not increase in the first or second Renewal Support Period, and in any subsequent Renewal Support Period maintenance may not increase by a value greater than the lesser of the Consumer Price Index (CPI) or 5% per annum.

Agreement § 4.2. Plaintiff contends that, because $22,500 is 15% of the original license fee of $150,000, the maintenance fee is always 15% of the annual license fee, which includes fees for additional capacity. Compl. ¶¶ 30, 33. Plaintiff alleges that Avaya owes an additional 15% on $550,000 per year—or $82,500—adding up to at least $495,000 for six years. Compl. ¶ 34.

With respect to payment for fees due, the Agreement provides:

SDL shall invoice Customer for all fees due under this Agreement (including all fees due pursuant to the Exhibits). Accurate invoices shall be due and payable in full within forty-five (45) days after the date of Customer's receipt of such invoice. Fees shall fall due when stated in Exhibit A.

Agreement § 4.3. Plaintiff's Complaint does not allege that it tendered any invoices for the fees allegedly owed.

**STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) ("Factual allegations must be enough to raise a right to relief above the speculative level."). On this motion to dismiss, this Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Dismissal is also appropriate to enforce an injunction against claims that are precluded. *See, e.g.*, *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000) ("Dismissal under Fed. R. Civ. P.

4

12(b)(6) is appropriate when a defendant raises claim preclusion or, as here, statutory waiver and bar as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."); *see also Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (claim barred by res judicata ).

Interpretation of contract language is a matter of law and therefore is typically suitable for disposition on a motion to dismiss. *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F. Supp. 2d 510, 516 (S.D.N.Y. 2005), *aff'd*, 168 Fed. App'x 474 (2d Cir. 2006); *ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC*, No. 601860-2009, 2010 WL 653972, at *3 (Sup. Ct. N.Y. Cnty. Feb, 24, 2010).[2] Similarly, on a motion to dismiss, "[i]f a document relied on in the complaint contradicts allegations in the copmlaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Roberts v. Bliss*, 229 F. Supp. 3d 240, 248 (S.D.N.Y. 2017) (quoting *Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559 (LTS)(JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012)).

## ARGUMENT

### I.    PLAINTIFF'S CLAIMS ARE WHOLLY BARRED BY AVAYA'S BANKRUPTCY PROCEEDINGS

Plaintiff's allegations relating to breach of the Agreement are wholly barred by various injunction orders issued by the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Plaintiff's failure to participate in any aspect of the bankruptcy proceedings, when it had the opportunity to file claims and assert objections, prevents Plaintiff from now purporting to assert claims under the Agreement, which was deemed assumed by the

---

[2]    The Complaint alleges—and Avaya agrees—that the "Agreement and all transactions under it shall be governed by the laws of the State of New York." Compl. ¶ 11 (quoting Agreement § 13.11).

bankruptcy plan. Accordingly, Plaintiff's Complaint must be dismissed pursuant to the order issued by the Bankruptcy Court.[3]

### A.  Plaintiff Declined to File a Claim or Objection in the Bankruptcy Court

On January 19, 2017 (the "Petition Date"), Avaya, along with certain of its affiliates (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court, the Honorable Stuart M. Bernstein presiding. *See* Case No. 1:17-bk-10089-SMB (Bankr. S.D.N.Y.), Bankr. Dkt. No. 1.[4] Avaya's claims-and-noticing agent Prime Clerk LLC served notice of the commencement of the chapter 11 cases by mail to Plaintiff at various addresses listed in Avaya's books and records. Bankr. Dkt. No. 378 at 1152.

On March 22, 2017, the Bankruptcy Court entered an order setting May 8, 2017 (the "Bar Date") as the last date for creditors to file claims against the Debtors based on: (a) prepetition claims and causes of action, or (b) claims or causes of action arising between the Petition Date and April 1, 2017. Bankr. Dkt. No. 301 (the "Bar Date Order"). The Bar Date Order further provided:

---

[3]  The Debtors, as defined below, reserve all of their rights in connection with improper actions taken by Plaintiff. *See In re Lehman Bros. Holdings, Inc.*, 645 Fed. App'x 6 (2d Cir. 2016) (upholding a bankruptcy court order imposing sanctions on plaintiff violating a bankruptcy sale order by commencing and continuing to prosecute a lawsuit against the purchaser of a debtor's assets where the purchaser bought the debtor's assets free and clear of claims and liens).

[4]  This Court can take judicial notice of "[r]ecords on the bankruptcy court's electronic filing system" on a motion to dismiss. *See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 584 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004).  For the Court's convenience, the pertinent portions of Avaya's Bankruptcy docket are attached as Exhibit A to the accompanying LaRocco Declaration. The full Bankruptcy docket and claims register are available via PACER and at https://cases.primeclerk.com/avaya. Cites to the Bankruptcy Court's docket are abbreviated herein as "Bankr. Dkt."

> Any entity who is required, but fails, to file a Proof of Claim . . . on or before the
> applicable Bar Date shall be forever barred, estopped, and enjoined from asserting
> such claim against the Debtors . . . and the Debtors and their property shall be
> forever discharged from any and all indebtedness or liability with respect to or
> arising from such claim.

Bar Date Order ¶ 17. On March 30, 2017, pursuant to the Bar Date Order, Prime Clerk LLC

served the Bar Date Notice and a Proof of Claim form, which was approved by the Bar Date

Order, by mail to Plaintiff. Bankr. Dkt. No. 354 at 1-2, 1430. Plaintiff did not file a proof of

claim in Avaya's bankruptcy case. *See generally* Bankr. Claims Register.

On November 3, 2017, Plaintiff was provided notice by mail of the hearing regarding

confirmation of the *Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor*

*Affiliates and (II) Granting Related Relief* (as amended, supplemented, or modified from time to

time, the "Plan"), to be held on November 28, 2017 (the "Confirmation Hearing Notice"). Bankr.

Dkt. No. 1489 at 1155.

Pursuant to the Plan, all of Avaya's executory contracts not otherwise assumed or

rejected were to be deemed assumed upon the Plan's Effective Date. Specifically, the Plan

provides, in relevant part:

> **On the Effective Date, except as otherwise provided herein, all Executory**
> **Contracts or Unexpired Leases not otherwise assumed** or rejected will be
> deemed assumed by the applicable Reorganized Debtor in accordance with the
> provisions and requirements of sections 365 and 1123 of the Bankruptcy Code . . .

> **Entry of the Confirmation Order shall constitute an order of the Bankruptcy**
> **Court approving the assumptions, assumptions and assignments, or**
> **rejections of such Executory Contracts or Unexpired Leases as set forth in**
> **the Plan**, the Assumed Executory Contract/Unexpired Lease Schedule, or the
> Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to
> sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise
> specifically set forth herein, assumptions or rejections of Executory Contracts and
> Unexpired Leases pursuant to the Plan are effective as of the Effective Date…

> In addition, any **objection to the assumption of an Executory Contract or**
> **Unexpired Lease under the Plan must be filed with the Bankruptcy Court on**
> **or before 30 days after the Effective Date**. Any counterparty to an Executory

> Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

Bankr. Dkt. No. 1579 at 51, Plan, Art. V(A) (emphasis supplied).

The Plan further provides that upon the assumption of an executory contract, any potential claim for damages arising from such contract as of the date of the assumption will be deemed satisfied and shall be forever barred. Bankr. Dkt. No. 1579 at 52, Plan, Art V(C). ("Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults."). The Agreement between Plaintiff and Avaya was listed as an executory contract on Avaya's schedule of executory contracts. Bankr. Dkt. No. 337, Schedule G. Plaintiff did not object to confirmation of the Plan, or to assumption of its Contract, or assert any claim for breach of the Contract prior to the confirmation hearing. *See generally* Bankr. Dkt. and Claims Register.

On November 28, 2017, the Bankruptcy Court entered an order confirming the plan. Bankr. Dkt. No. 1579 (the "Confirmation Order"). The Plan's Effective Date occurred on December 15, 2017, whereupon Avaya provided notice of this occurrence to Plaintiff, which included notice that requests for payment of allowed administrative claims must be filed with the Bankruptcy Court and served on the Debtors by March 15, 2018, to Plaintiff. Bankr. Dkt. Nos. 1677, 1691 at 1, 731. Plaintiff did not file any request for an administrative claim by March 15, 2018. To date, Plaintiff has not filed any claim in Avaya's bankruptcy case, or sought leave to file any claim with the Bankruptcy Court. *See generally*, Bankr. Dkt. And Claims Register.

The Confirmation Order expressly incorporated the discharge and injunction provisions of Article VIII of the Plan, specifying:

> [T]he distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims . . . and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against . . . the Debtors.

Confirmation Order at 47-48 (the "Discharge Injunction"); *see id.* at 48 ("The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring."). The Discharge Injunction continues and remains in force to date. *See* Bankr. Dkt. No. 1579 at 69, Plan, Article XII(G).

### B. Any Breaches of the Agreement, Including Those Alleged in the Complaint, Were Deemed Satisfied Upon the Agreement's Assumption Pursuant to the Bankruptcy Plan, Under Which Plaintiff Never Filed a Claim or Objected

Plaintiff's claim for breach of the Agreement prior to December 15, 2017 is wholly barred because the Agreement was assumed upon the Plan's Effective Date, and any alleged breaches occurring thereunder as of such date were fully satisfied and released.

"[C]ontract assumption is an important re-organizational tool under Chapter 11 because it allows [a debtor] to go through the inventory of executory contracts . . . and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject." *In re Wireless Data, Inc.*, 547 F.3d 484, 488 (2d Cir. 2008) (citations omitted). It is vital that the debtor know the "universe of claims" arising under the contract to be assumed, so that it can determine whether assumption or rejection is more beneficial to its estate. *Id.* at 488-89. This is necessary to provide the "fresh start" promised by the Bankruptcy Code.

Accordingly, "a final order confirming a chapter 11 plan bars litigation of all issues that could have been raised in connection with confirmation. . . . Numerous courts . . . on numerous occasions [have held] that a bankruptcy court order approving the assumption of an executory contract, or confirming a plan that provides for the assumption of an executory contract, is

necessarily a finding that no uncured defaults exist." *In re Arriva Pharm., Inc.*, 456 B.R. 419, 424 (Bankr. N.D. Cal. 2011) (internal citations omitted); *see also Daewoo Int'l (Am.) Corp. Creditor Tr. v. SSTS Am. Corp.*, No. 02 CIV. 9629 (NRB), 2003 WL 21355214, at *3 (S.D.N.Y. June 11, 2003) ("As a general matter, a debtor's plan of reorganization, once confirmed, binds the debtor and all creditors, whether or not a creditor has accepted the plan."); *OneBeacon Ins. Co. v. Empress Ambulance Serv., Inc.*, No. 02 Civ. 2595 (WHP), 2003 WL 1857622, at *3 (S.D.N.Y. Mar. 28, 2003) (finding, after taking judicial notice of a confirmed plan, that asserted claims were barred because "[u]nder § 1141(d)(1) of the Bankruptcy Code, the confirmation of a plan of reorganization discharges the debtor from any debt that arose before the date of such confirmation, whether or not a proof of claim based on such debt is filed or the holder has accepted the plan").

The Plan, confirmed by the Bankruptcy Court, explicitly provides that any claim for breach of an assumed contract is released and satisfied as of the Effective Date. This language unequivocally sets forth the treatment of executory contracts—including the Agreement at issue in the Complaint. The Agreement was not otherwise assumed or rejected prior to the Effective Date of the Plan. Therefore, upon entry of the Confirmation Order, the Agreement was deemed assumed on the Effective Date, and any alleged breach of the Agreement was deemed satisfied and released.

Pursuant to the Plan, the Discharge Injunction prohibits Plaintiff's attempt to seek damages from Avaya for purported pre-Effective Date harm, due to Plaintiff's failure to contest assumption of the Agreement (and related release of extant claims) and Plaintiff's failure to file an administrative claim by March 15, 2018. Further, pursuant to the Bar Date Order Injunction, Plaintiff is enjoined from bringing any prepetition breach claim against Avaya due to its failure

to file a proof of claim by May 8, 2017. Plaintiff is further barred by the injunction provided in section 524 of the Bankruptcy Code, which "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor" following the discharge of debts pursuant to a confirmed plan. 11 U.S.C. § 524(a)(2).

In sum, even though Plaintiff was issued multiple notices throughout the chapter 11 case, it failed to take any action to preserve its purported breach-of-contract claim. Plaintiff asserts that Avaya has been in breach of the Agreement well before Avaya's bankruptcy filing, let alone the confirmation of the Plan. If Plaintiff believed it had a prepetition claim, it should have filed a proof of claim by the Bar Date. If it believed Avaya was continuously breaching the Agreement after the Petition Date, it should have filed an administrative claim.

And, once Avaya sought to assume the Agreement pursuant to the Plan, Plaintiff had yet another opportunity to object to such assumption or to assert its claim within 30 days after the Effective Date. Had Plaintiff done so, Avaya would have had the opportunity to evaluate the Agreement and likely would have exercised its statutory right to reject the Agreement. Instead, Plaintiff failed to take any action during Avaya's nearly year-long bankruptcy proceedings, and now seeks to assert multi-million-dollar damages for prepetition and pre-Effective Date harm. Yet Plaintiff's claim for breach of the Agreement prior to the Effective Date is wholly discharged, and Plaintiff is permanently enjoined from further action to collect on account of such claim. The Complaint should therefore be dismissed.

## II. PLAINTIFF FAILS TO STATE A BREACH OF CONTRACT CLAIM BECAUSE THE AGREEMENT'S PLAIN LANGUAGE BELIES PLAINTIFF'S ALLEGATIONS

Even assuming (without conceding) that Plaintiff's claims were not barred by the Bankruptcy Court's order, Plaintiff's Complaint nevertheless fails in its own right. At every turn, Plaintiff's Complaint asserts theories of damages that are flatly precluded by the Agreement's plain language. Because Plaintiff's allegations rest on no set of plausible facts and instead depend wholly on a series of strained interpretations that are commercially unreasonable—to say nothing of being contradicted on the face of the Agreement—this Court should dismiss Plaintiff's first cause of action.

### A.    Plaintiff Has Not Alleged Its Own Performance Under the Agreement

At the threshold, Plaintiff's claim for breach of contract should be dismissed because the Complaint does not—and cannot—allege that Plaintiff itself performed as required under the Agreement. *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 450 (S.D.N.Y. 2014) (dismissing contract-breach claim that did not plead all of the elements under New York law: "(1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages suffered as a result of the breach"). As Plaintiff points out, the Agreement specifies that "Fees shall fall due when stated in Exhibit A." Compl. ¶ 17 (quoting Agreement § 4.3). But the Complaint conveniently fails to include the remainder of this section, which provides that "[Plaintiff] **shall** invoice [Avaya] for all fees due under this Agreement," and that "[a]ccurate invoices **shall** be due and payable in full within 45 days" of receiving them. Agreement § 4.3. Likewise, Exhibit A to the Agreement, under "Fee Due Dates," provides that license, maintenance and hosting fees "**shall**" be invoiced. Agreement Ex. A at 12 (emphasis supplied).

Likewise, in its Exhibit A, under "Additional Capacity," the Agreement provides that "Once annually, the parties **will** review utilization of Source Words and **will** determine if any increase in licensed capacity is necessary." Agreement, Exhibit A at 11 (emphasis supplied). The Complaint is equally silent concerning whether Plaintiff ever met its obligation to hold such an annual meeting.

Thus, the Agreement is unequivocal in its direction, logically included to prevent disputes of exactly this type, that: (i) all fees must be invoiced and Avaya given a 45-day period in which to pay those fees, and (ii) the parties meet annually to discuss licensed capacity. *See, e.g., Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353, 980 N.Y.S.2d 903, 908 (2013) ("shall" evinces the mandatory nature of the obligation).[5] Here, the Complaint conspicuously lacks any allegation that Plaintiff tendered any kind of invoice, let alone an "accurate" one. Nor does it allege that Plaintiff allowed the 45-day payment window after Avaya received an accurate invoice. It also does not allege that Plaintiff ever sought the annual review of Avaya's utilization of Source Words required by the Agreement. Indeed, Plaintiff cannot so plead because in the many years since the Agreement was executed in 2006, Plaintiff never invoiced Avaya for the amounts it alleges are due in the Complaint and never met with Avaya to discuss whether an increase in licensed capacity was necessary.

---

[5]   The provision for "accurate" invoices further confirms that payments cannot be due unless and until Plaintiff tenders an invoice that correctly identifies owed fees. *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 147 (2d Cir. 2017) (cleaned up) (applying New York law that "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions") (citation omitted); *see also Roman Catholic Diocese of Brooklyn v. Christ the King Regional High School*, 164 A.D.3d 1390, 1393, 84 N.Y.S.3d 246, 249 (2d Dep't 2018) ("Likewise, a contract should not be read so as to render any term, phrase, or provision meaningless or superfluous.")

Plaintiff's failure to plead its own performance under the Agreement—including the very performance that would trigger payment under the Agreement, which is the basis of Plaintiff's claims—is fatal to the Complaint. *Transcience Corp.*, 50 F. Supp. 3d at 451 (granting motion to dismiss contract-breach claim when plaintiff failed to plead Plaintiff's own performance). Plaintiff's contractual claims should therefore be dismissed.

### B. Plaintiff's Claims Rest on a Series of Legally Impermissible Readings of the Agreement

Even if Plaintiff had adequately pleaded its own performance such that additional fees could be due, the Complaint tortuously misconstrues any reasonable reading of the Agreement in computing such fees. Under New York law, a contract may not be "interpreted in a commercially unreasonable manner or contrary to the reasonable expectations of the parties." *ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC*, No. 601860-2009, 2010 WL 653972, at *5 (Sup. Ct. N.Y. Cnty. Feb. 24, 2010) (citation omitted) (granting motion to dismiss when plaintiff put forth a commercially unreasonable theory of liability under the contract); *see also Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (cleaned up) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (citation omitted).

Despite these well-established maxims, the Complaint betrays a strained reading of the Agreement that does not comport with commercial reasonableness or the parties' expectations as expressed in the Agreement's plain meaning.

### 1. Plaintiff's claims for license fees depend on mistaken interpretations of the Agreement.

In alleging that Avaya exceeded its allotment of 1.7 million "Source Words," the Complaint desperately relies on an assumption that part of the provision for 1.7 million "Source

Words" has no meaning. Even if Plaintiff's strained reading of the Agreement were correct, it is barred from seeking any licensing fees in excess of $550,000, or the difference between the license fee Plaintiff acknowledges Avaya has paid and the undisputed license-fee cap of $700,000.

> a.   Plaintiff's reading of "Source Words" is contrary to the Agreement's plain language and standards of commercial reasonableness and would lead to absurd results.

As the Complaint points out, the Agreement provides:

> TMS base license includes 1.7 million words of English language material (known as "Source Words") per annum. Source Words are only considered within this allowance if the words are actually processed for translation, and not if they are matched by the translation memory process.

Agreement at 10.

The Complaint attempts to read out the second sentence by arguing that it does not mean what it says. Plaintiff imaginatively alleges that the sentence, "Source Words are only considered within this allowance if the words are actually processed for translation, and not if they are matched by the translation memory process" actually applies not to "Source Words," or "English language material," but to "translated words, i.e., the Source Words after they are translated." Compl. ¶ 15. Such a tortured reading is diametrically opposed to this provision's plain words, which can mean nothing other than that some English language material is not considered within the 1.7-million-word allotment if those English words were previously "matched by the translation memory process." Indeed, this understanding that not all English words count towards the 1.7-million-word limit is how the parties have been operating under the Agreement since it was executed in 2006.

Plaintiff's unsupported interpretation of the Agreement plain language is not only belied by the Agreement's plain meaning, but also by standards of commercial reasonableness and the

fact that it would produce absurd results. Under Plaintiff's interpretation, every single instance of English-word input—including articles like "the" or "a" or "an"—chips away at the 1.7-million-word limit, every time they are submitted for translation, without limit. Apart from flatly ignoring the word "memory" from the limiting principle of the "translation memory process," the interpretation also renders the "Source Words" allocation to be commercially impracticable. *ING Real Estate Fin.*, 2010 WL 653972, at *5 (dismissing contract-breach claim when plaintiff's interpretation would produce an absurd and disproportionate outcome that "could not have been intended by the parties").

After correcting Plaintiff's patently incorrect interpretation of the "translation memory process" provision, it becomes clear that Plaintiff has alleged no facts to support its conclusory allegation that "Avaya has breached the Agreement by exceeding 1.7 million Source Words," Compl. ¶ 19. Even assuming in this procedural posture that Avaya tendered over 10 million English-language words for translation in 2012-2013, over 12 million in 2013-2014, etc., Compl. ¶ 18, Plaintiff alleges no facts that would indicate that more than 1.7 million of these words were *not* "matched by the translation memory process" and therefore not "considered within this [1.7-million-word] allowance." Agreement, Exhibit A at 10. Accordingly, this Court should dismiss Plaintiff's claim for breach of contract in connection with license fees, which rests on a pure misconstruction of the Agreement's language.

> **b.    Even if Avaya were liable for additional license fees, Plaintiff may not ignore the license fee cap.**

Plaintiff correctly acknowledges that Avaya paid a license fee of $150,000. Compl. ¶ 21. Plaintiff also rightfully acknowledges that the Agreement "provides for a License Fee cap of $700,000." Compl. ¶ 21. Indeed, the Agreement provides:

> The maximum license fee payable under this agreement, including any additional capacity and the CMS connector licenses but not including Author Assistant or

> any other additional licenses as described in this section, is $700,000. At the point that a license fee of $700,000 is reached for the relevant license, such licenses become "unlimited" with regard to volume.

Agreement at 11.

Plaintiff half-heartedly attempts to explain away this cap, alleging without any support whatsoever that "once that amount is 'reached', the cap does not apply and/or SDL is excused therefrom, because" of Avaya's alleged breach. Compl. ¶ 21. Apart from the patently absurd notion that a "cap" can cease to apply because it has been "reached," thus defeating the very purpose of a cap, Plaintiff in no way attempts to find support for its reading in the text of the Agreement, which contains none of the conditions Plaintiff baselessly attempts to impose. Because this Court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement," *In re DPH Holdings Corp.*, 553 B.R. 20, 26 (Bankr. S.D.N.Y. 2016) (quoting *Chesepeake Energy Corp. v. Bank of N.Y .Mellon Trust Co, N.A..*, 773 F.3d 110, 113 (2d Cir. 2015), *aff'd*, 837 F.3d 146 (2d Cir. 2016)), Plaintiff may not simply wish away the license fee cap, against the parties' intent as expressed in the Agreement's plain terms. Thus, this Court should dismiss Plaintiff's claims to the extent Plaintiff seeks any recovery for license fees above $550,000.

### 2. Plaintiff's reading of "fixed" hosting fees is contrary to the Agreement's plain language.

Equally strained is Plaintiff's interpretation of the Agreement in connection with hosting fees. As the Complaint correctly points out, the Agreement provides that hosting fees are "$20,000 per annum, fixed with regard to usage, capacity limits, number of authorized users and number of Author Assistant licenses or SDL Trados licenses." Compl. ¶ 25 (quoting Agreement Ex. A).

For this provision, Plaintiff creates out of whole cloth a novel "banding" scheme. The Complaint creatively alleges that "Avaya owes Hosting Fees of $20,000 for each capacity limit, or allotment, of 1.7 million source words." Compl. ¶ 26. Of course, this alleged scheme is afforded no support at all in the plain language of the Agreement, which instead plainly provides that the fee is "$20,000 per annum, *fixed with regard to usage, capacity limits,*" etc., and not "variable" with regard to Source Words. Agreement Ex. A (emphasis added).

Plaintiff's interpretation curiously reads "fixed," which Merriam-Webster defines as "securely placed or fastened," or "nonvolatile," to mean the exact opposite.[6] Instead, Plaintiff reads "fixed" to mean "variable," as if the hosting fees change in relation to capacity limits.[7] *See* Compl. ¶ 26. This assertion violates another maxim of contract interpretation under New York law, that "[t]he use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings." *NFL Enters. LLC v. Comcast Cable Commc'ns*, 51 A.D.3d 52, 60-61, 851 N.Y.S.2d 551, 557 (1st Dep't 2008); *see also In re DPH Holdings Corp.*, 553 B.R. at 27 ("The meaning of particular language . . . should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.") (citation omitted). As the Complaint shows, the Agreement conspicuously provides that hosting fees are "$20,000 per annum, *fixed* with regard to usage," etc., right after the provision that maintenance fees are "$22,500 per annum *variable* in accordance with the terms of this Agreement." Agreement Ex. A (emphasis added). Plaintiff's

---

[6]   *Fixed*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/fixed.

[7]   Although Plaintiff contends that "'Capacity limits' are defined to be 1.7 million Source Words." Compl. ¶ 26. The Agreement nowhere contains such a definition. To the extent Plaintiff is relying on the header "Capacity limits" in Exhibit A, such a reading is belied by section 13.9, which provides that "article, section and subsection headings . . . are intended for reference purposes only and shall not affect the interpretation or construction of any provision of this Agreement." Agreement § 13.9.

strained interpretation would read both "fixed" and "variable" to mean "variable," contrary to the parties' intentions as expressed in the plain language of the Agreement.

Even assuming Plaintiff is owed hosting fees, they would in no event be more than $20,000 per year, as is plainly provided for in the Agreement, and in accordance with the parties' course of conduct for years, until Plaintiff's specious allegations in this action. Plaintiff's conclusion that these fees somehow amount to a liability of $880,000 is completely lacking in merit. Accordingly, this Court should dismiss Plaintiff's claims for hosting fees to the extent they exceed a fixed fee of $20,000 per year.

### 3. Plaintiff's claims for maintenance fees violate the Agreement's plain language.

In contrast to the Agreement's provision for hosting fees, maintenance fees are indeed "variable in accordance with the terms of this Agreement." Compl. ¶ 29 (quoting Agreement Ex. A). But the Complaint conveniently fails to reference the "terms of this Agreement" that provide for the maintenance fees' variability. The Agreement's section 4.2 provides, in pertinent part:

> 4.2    Maintenance Fee. . . . SDL will provide written notice to the Customer not less than sixty (60) days prior to the end of the Initial Support Period or Renewal Support Period by way of an invoice for the next Renewal Support Period. The Customer may elect to proceed with the next Renewal Support Period, or may terminate this Agreement as of the end of the Initial Support Period or a Renewal Support Period . . . The Maintenance Fee shall not increase in the first or second Renewal Support Period, and in any subsequent Renewal Support Period maintenance may not increase by a value greater than the lesser of the Consumer Price Index (CPI) or 5% per annum.

Agreement § 4.2 (emphasis supplied).

Here, Plaintiff invents yet another creative reading of the Agreement that undermines its plain terms. The Complaint alleges that the maintenance fee should track an increase in the license fee, which Plaintiff alleges includes fees associated with "additional capacity" for Source Words exceeding the 1.7-million-word allotment. Compl. ¶ 33. The Complaint purports to

support this interpretation by pointing to provisions for a 15% licensing fee for "additional Multiterm licenses," which Plaintiff admits are not at issue here, and somehow concludes that Avaya owes a maintenance fee of $82,500 per year. Compl. ¶¶ 31, 34.

Plaintiff's strained interpretation fails for a number of reasons. First and foremost, there is absolutely no support in the Agreement for Plaintiff's contentions. The Agreement's plain and unambiguous terms provide a clear limit on the amount Plaintiff may charge for maintenance fees annually; they "may not increase by a value greater than the lesser of the Consumer Price Index (CPI) or 5% per annum." Agreement § 4.2. Plaintiff's assertion that Avaya could owe a maintenance fee of $82,500 is mathematically impossible given this limitation.[8]

Further, Plaintiff may not rely on provisions setting a maintenance fee at 15% of the license fee for "additional Multiterm licenses" or "[a]dditional [SDL Trados 2006] licenses" when the Complaint is devoid of any allegation that those licenses are at issue here. They are not. Accordingly, Plaintiff's entire theory on Avaya's alleged liability for maintenance fees rests on a legally impermissible reading of the Agreement, and Plaintiff pleads no facts that would support its claim for maintenance fees. This claim should therefore be dismissed to the extent it seeks fees in excess of amounts permissible under the Agreement's plain language.

---

[8] Even assuming a 5% increase in every year under the Agreement, beginning in 2006, Compl. ¶ 1, Avaya's maintenance fee could in no instance be higher than approximately $42,000:

| Year | Maint. Fee Principal | 5% Increase | Max. Maint. Fee | | Year | Maint. Fee Principal | 5% Increase | Max. Maint. Fee |
|------|---------------------|-------------|-----------------|---|------|---------------------|-------------|-----------------|
| 2006 | 22,500.00 | 1,125.00 | 23,625.00 | | 2013 | 31,659.76 | 1,582.99 | 33,242.75 |
| 2007 | 23,625.00 | 1,181.25 | 24,806.25 | | 2014 | 33,242.75 | 1,662.14 | 34,904.89 |
| 2008 | 24,806.25 | 1,240.31 | 26,046.56 | | 2015 | 34,904.89 | 1,745.24 | 36,650.13 |
| 2009 | 26,046.56 | 1,302.33 | 27,348.89 | | 2016 | 36,650.13 | 1,832.51 | 38,482.64 |
| 2010 | 27,348.89 | 1,367.44 | 28,716.33 | | 2017 | 38,482.64 | 1,924.13 | 40,406.77 |
| 2011 | 28,716.33 | 1,435.82 | 30,152.15 | | 2018 | 40,406.77 | 2,020.34 | 42,427.11 |
| 2012 | 30,152.15 | 1,507.61 | 31,659.76 | | | | | |

### III.    PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

Plaintiff's second cause of action, for unjust enrichment, fails to state a claim because it is based on the same facts as its contract claim. Unjust enrichment is "an obligation the law creates in the absence of any agreement." *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 587 (2005). Plaintiff can assert no claim for unjust enrichment when "the matter is controlled by contract." *Id.*; *see also Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery" for unjust enrichment "for events arising out of the same subject matter.") (citation omitted).

Accordingly, New York courts routinely dismiss unjust enrichment claims in complaints that allege a breach of contract based on the same set of events. *See, e.g.*, *Feigen v. Advance Capital Mgmt. Corp.,* 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989). This case is no different, given that Plaintiff's claim for unjust enrichment is based on the same facts as Plaintiff's contract claim and that Avaya does not dispute the existence and validity of the Agreement.

Apart from this, Plaintiff's claim for unjust enrichment fails for the same reasons its contractual claims fail. Namely, Plaintiff has alleged no facts supporting an allegation that Avaya has exceeded its 1.7-million-word allotment, given the Agreement's definition of "Source Words" and how they are counted. *See supra* B.1.a. Accordingly, this Court should dismiss Plaintiff's claim of unjust enrichment.

## CONCLUSION

As a matter of law, Plaintiff's claims are barred by Avaya's bankruptcy proceedings. Even were this Court to decline to dismiss Plaintiff's claims on that basis, each of the Complaint's individual theories of contractual liability are fatally flawed. For the forgoing reasons, Avaya respectfully requests that this Court dismiss the Complaint in its entirety.

Dated: January 7, 2019
       New York, New York

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:   /s/ Chris LaRocco
      Chris LaRocco
      1290 Avenue of the Americas
      New York, New York 10104
      Tel: (212) 541-2000
      E: chris.larocco@bclplaw.com

*Attorneys for Avaya, Inc.*

12364889